UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

———————————————————————— )
                                          )
ZURICH AMERICAN INS. CO., et al.,         )
                                          )
          Plaintiffs,                     )
                                          )
v.                                        )          Civil Action No. 10-11190-NMG
                                          )
WATTS REGULATOR CO., et al.,              )
                                          )
          Defendants.                     )
———————————————————————— )


REPORT AND RECOMMENDATION ON THE PLAINTIFFS'
MOTION FOR PARTIAL SUMMARY JUDGMENT AND
SPENCE/CIRCOR'S MOTIONS FOR SUMMARY JUDGMENT

March 2, 2012

SOROKIN, M.J.

        The Plaintiffs, Zurich American Insurance Company and American Guarantee and

Liability Insurance Company (collectively, "Zurich") have brought suit against the Defendants,

Watts Regulator Company, Watts Water Technologies, Inc. (collectively, "Watts"), Spence

Engineering Company, Inc. and CIRCOR International, Inc., seeking to recover premium

allegedly owed under an insurance contract.  Docket # s 1, 23.

        Currently pending are three summary judgment motions.  Zurich has moved for Partial

Summary Judgment, seeking a determination that Watts is liable to it on Count I of the Amended

Complaint.  Docket # 49.  Spence and CIRCOR have filed two Rule 56 motions, in serial

fashion. Docket #s 74, 100.[1]

For the following reasons, I RECOMMEND that the Court: ALLOW Zurich's Motion for
Partial Summary Judgment (Docket # 49); DENY CIRCOR's First Motion for Summary
Judgment (Docket # 74); and, ALLOW CIRCOR's Second Motion for Summary Judgment
(Docket # 100).

I.      FACTUAL AND PROCEDURAL BACKGROUND

Zurich is a corporation engaged in the insurance business. Docket # 23 at ¶¶ 2-3.[2]
Watts manufactures and distributes various plumbing, heating, and water quality products.
Docket # 50 at ¶ 2. Watts was affiliated with Spence until 1999, at which time Watts spun off its
oil and gas-related subsidiaries (including Spence) to CIRCOR. Id. at ¶ 18: Docket # 66 at Watts
¶ 29.

Zurich provided workers compensation, general liability, and business auto insurance
coverage to Watts for the policy period of June 30, 1985, to June 30, 1986. Docket # 23 at ¶ 3.
The insurance program covered not only Watts, but also several entities affiliated with it,
including Spence. Id.; Docket # 67-1 at 2-3. The insurance contracts were
"retrospectively-rated," meaning that the insureds agreed to share in responsibility for claims up
to certain loss limits agreed to by Watts and Zurich. Docket # 23 at ¶ 10. Under the insurance
contracts, retrospective adjustments were made by Zurich based on incurred losses (including

---

[1]  Also pending is CIRCOR's Motion to Strike (Docket # 72) which is the subject of a
separate Order of this same date.

[2]  Citations to the record throughout refer to the pagination assigned by the Court's
CM/ECF docketing system, rather than to any internal pagination of the documents or exhibits
themselves.

actual losses paid, reserves for unpaid losses, legal expenses and legal expense reserves).  Id. at

¶ 11.  Zurich and Watts entered into three interrelated agreements: insurance policy number

CGL384454-00 (the Policy), a Retrospective Rating Agreement (RRA) and a Premium Payment

Agreement (PPA).  Id. at ¶ 1; Docket # 67-1; Docket # 23-1.

Since the inception of the insurance contracts in 1985, Watts has paid to Zurich (both on

its own behalf and on behalf of its subsidiaries and affiliated companies) over $1 million in both

initial and retrospective premium.  Docket # 23 at ¶ 13.  From 1985-1990, Zurich submitted

invoices to Watts, and Watts made payments to Zurich, pursuant to the PPA (which by its terms

provided for quarterly computation of retrospective premium, but expired after approximately

five and one-half years).  See Docket # 23-1 at 5-9.  Between approximately 1991-2001, Zurich

continued to submit invoices to Watts, and Watts continued to make payments to Zurich,

pursuant to the terms of the RRA, which provides for annual computation of the retrospective

premium.  Id. at 3.  At no time between 1985 and 1999 did Watts refuse to make payment under

the insurance contracts (on its own behalf, or on behalf of its subsidiaries), nor did it raise any

objection to Zurich's invoices (at least not in any respect relative to the issues in this case).

Zurich has submitted to Watts (either directly or through Zurich's agent, Marsh USA),

invoices reflecting the Sixteenth through Nineteenth premium adjustments totaling $816,185.

Docket # 23 at ¶ 14.  Watts has denied liability under the insurance contract to pay Zurich the

$816,185, plus interest, which Zurich claims it is owed.  Id. at ¶ 19.  Watts asserts that the

asbestos lawsuits giving rise to most if not all of the retrospective premium Zurich seeks to

collect in this lawsuit "are associated with suits that were not filed against Watts," but against

Spence.  Id.

Prior to Watts's 1999 spinoff of Spence, there was some discussion between Zurich and Marsh as to how Watts wanted to handle the post-spinoff premium billing.  On July 20, 1999, Anthony Amadeo of  Zurich wrote to Monica Cameron of Marsh and stated that:

> the historical breakout of the two companies will, in my mind, be a major challenge. It will involve amending the agreements, splitting out the exposures, revising the adjustment factors, revising the collateral, etc.  I think that we need to have a 'meeting of the minds' to see exactly what it is that Watts is trying to accomplish.

Docket # 98-3 at 5 (emphasis added)

In the October 1999, Distribution Agreement (between Watts and Spence, but not Zurich) which governed Watts's spinoff of its oil and gas-related subsidiaries (including Spence) to CIRCOR, CIRCOR agreed to "pay, perform and discharge" all CIRCOR Liabilities "whether arising before, on or after" the spinoff, specifically including liabilities for "asbestos cases arising from the sale of the Spence  .  .  .  products."  Docket # 66 at Watts ¶ 29.  The separate question of the Distribution Agreement's allocation of responsibility for the retrospective premium between Watts and CIRCOR (i.e., whether Watts would ultimately be able to recover from CIRCOR pursuant to the terms of the Distribution Agreement any sums recovered by Zurich from Watts in this litigation) is not presented by the claims to be adjudicated here and is (at least in CIRCOR's view) subject by the terms of the Distribution Agreement to arbitration.

On November 18, 1999, a Marsh employee wrote to Zurich stating that, "effective immediately Watts and CIRCOR require separate paid loss reimbursement invoices and loss runs from Zurich.  Each is responsible for only its own loss history. Watts cannot reimburse Zurich for CIRCOR losses and CIRCOR cannot pay for Watts losses."  Id. at Watts ¶ 30; Docket # 67-3. On that same day, Zurich issued a bill relating to the insurance contracts at issue and (although none of the charges therein related to Spence) divided the charges between CIRCOR and Watts.

Docket # 66 at Watts ¶ 31.

In approximately 2001, CIRCOR began sending to Zurich summonses and complaints relating to asbestos suits against Spence and requesting coverage under the insurance contracts. Docket # 66 at Watts ¶35. On August 21, 2001, Zurich wrote to CIRCOR and agreed to participate in the defense of the Spence-related claims under the policy. Id. at Watts ¶ 38. On January 17, 2003, Zurich sent an invoice for retrospective premium relating to losses from the Spence asbestos cases to Marsh. Id. at Watts ¶¶ 39-40. Marsh responded to Zurich that $102,078 of the adjustment was "the responsibility of CIRCOR and not that of Watts." Id. at Watts ¶ 41 Two weeks later, Marsh issued a credit invoice to Watts for that amount with the instructions "DO NOT PAY." Id. at Watts ¶ 42. Zurich employees informed Marsh that Watts's portion of the invoice was $702 and Watts paid this amount. Id. at Watts ¶ 43. In June, 2003, Zurich instructed Marsh to seek the remaining balance from CIRCOR. Id. at Watts ¶ 44. CIRCOR did not pay the invoice (and the record does not reflect any payment from CIRCOR to Zurich for any retrospective premium related to losses stemming from the Spence asbestos cases, despite Zurich's efforts to collect additional premium from CIRCOR in 2004-2005 ). Id. at Watts ¶¶ 46-49. Beginning in approximately September 2008, Zurich attempted to collect the Spence-related amounts due from Watts.

II.    DISCUSSION

    Standard of Review

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Once a party has properly supported its motion for summary judgment, the

burden shifts to the non-moving party, who "may not rest on mere allegations or denials of his pleading, but must set forth specific facts showing there is a genuine issue for trial." <u>Barbour v. Dynamics Research Corp.</u>, 63 F.3d 32, 37 (1st Cir.1995)(quoting <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 256 (1986)).  Moreover, the Court  is "obliged to view the record in the light most favorable to the nonmoving party, and to draw all reasonable inferences in the nonmoving party's favor."  <u>LeBlanc v. Great American Ins. Co.</u>, 6 F.3d 836, 841 (1st Cir.1993).  Even so, the Court is to ignore "conclusory allegations, improbable inferences, and unsupported speculation." <u>Sullivan v. City of Springfield</u>, 561 F.3d 7, 14 (1st Cir.2009).

**Zurich's Motion for Partial Summary Judgment** (Docket # 49)

Zurich has moved for partial summary judgment, seeking a finding that Watts is liable to Zurich for any premium due under the insurance contracts at issue, including premium arising from asbestos lawsuits filed against Spence.[3]

In different contexts, Zurich has advanced two theories with respect to Watts's potential liability for the retrospective premium: first, in the context of its Motion for Partial Summary Judgment, it has advanced the argument that Watts is solely responsible for the premium; and, alternatively in opposition to CIRCOR's Second Motion for Summary Judgment, it has advanced the argument that Watts and CIRCOR are jointly and severally liable for the retrospective premium.[4]

Zurich argues in its Motion for Partial Summary Judgment that Watts is liable to it because (1) the insurance contracts unambiguously provide that the insured shall pay the

---

[3]  Zurich's motion does not seek summary judgment as to the amount of its damages.

[4]  For discussion of the joint and several liability theory, <u>see</u> <u>infra</u>, at 15-17.

retrospective premium; (2) the insured is defined as Watts "on its own behalf and on behalf of its subsidiaries and affiliated companies"; (3) although Spence is also insured under the insurance contracts, nothing in those contracts obligates Zurich to collect premium from Spence, or obligates Spence to pay premium; (4) by their terms, the insurance contracts can be modified only by written agreement, which has not occurred; (5) the insurance contracts also have not been novated or waived; and, (6) whatever agreements may have been made between Watts and Spence/CIRCOR, Zurich was not a party to those agreements and is not bound by them. Docket # 58.

Watts opposes the motion on the bases that: (1) Watts entered into the agreement with respect to Spence as an agent for Spence, its undisclosed principal, thereby unambiguously obligating Spence and not Watts with respect to the disputed premium; (2) that to the extent the insurance contracts are ambiguous, the Parties' course of conduct illustrates their intention that Spence be liable for the contested premium; and, (3) that the Parties' post-agreement conduct novated or modified the insurance contracts, or acted as a waiver.

<u>The Identity of the Premium Payor As Defined By The Insurance Contracts</u>

The interpretation of an unambiguous agreement or policy presents an issue of law for the Court's determination. <u>116 Commonwealth Condominium Trust v. Aetna Cas. & Surety Co.</u>, 433 Mass. 373, 376 (2001). Insurance policy language must be construed in its usual and ordinary sense. <u>Id.</u> Ambiguity is not established by the fact that the parties to an agreement disagree as to its meaning. <u>Lumbermans Mut. Cas. Co. v. Offices Unlimited, Inc.</u>, 419 Mass. 462, 466 (1995). Insurance policy language is ambiguous only where it is susceptible of more than one meaning and reasonably intelligent persons would differ as to which meaning is proper.

Citation Ins. Co. v. Gomez, 426 Mass. 379, 381 (1998).

The insurance contract documents unambiguously identify Watts as the party responsible for paying retrospective premium. For example, the RRA provides that, "[t]his agreement [is] entered into by Watts Regulator Company, Inc., on its own behalf and on behalf of its subsidiaries and affiliated companies (herein called 'the insured') and Zurich Insurance Company (herein called 'the Company')." Docket # 23-1 at 2 (emphasis added). Section IV(C) of the RRA then provides that, "if an earned retrospective premium is greater than the premium subject to the retrospective rating previously paid to the company, the insured shall pay the difference to the company." Id. at 4 (emphasis added). Throughout, the insurance contracts provide for no separate treatment of the insureds (i.e., Watts and its subsidiaries and affiliated companies), nor do they provide for separate calculation of premium related to each. Likewise, the provision governing cancellation is unitary, making no provision for cancellation of the policy other than by Watts and its affiliates and subsidiaries collectively. Id.

Similarly, the PPA recites in part that it is an agreement "between Watts Regulator Company, Inc. ('You') and Zurich Insurance Company/American Guaranty and Liability Insurance Company ('We; Us; The Company')." Docket # 23-1 at 5 (emphasis added). Section V, which covers the retrospective premium adjustment, states in relevant part that "[i]f the actual earned retrospective basic premium (including premium tax[)] is greater than the sum previously collected for this item, You will pay, upon receipt, the difference to the Company." Id. at 7 (emphasis added). Nothing in the insurance contracts describes any mechanism by which any entity other than Watts would be liable to pay premium to Zurich.

Given the lack of ambiguity in the terms of the contract concerning the identity of the

payor, the Court need not consider whether the Parties' subsequent course of conduct resolves any textual ambiguity by illustrating the Parties' intent. Their intent is clear from the contractual language. See Bank v. Thermo Elemental Inc., 451 Mass. 638, 649 (2008) (consideration of extrinsic evidence necessary only where a contract is ambiguous on its face or as applied, not as a basis for determining ambiguity, or the lack thereof, in the first instance).[5]

The fact that Spence and Watts subsequently ended their affiliation does not alter the plain language of the insurance contract. See, e.g., Liberty Mut. Ins. Co. v. United Techs. Corp., 2003 WL 369673 (Mass.Sup.Ct.) (corporation was liable for retrospective premium, even though it related to an affiliate since sold). In Liberty, United Technologies Corporation (UTC) purchased two general liability and twenty-five workers compensation policies from Liberty. Id. at * 1. On the policies at issue, UTC was the principal "named insured." Id. at *1, n.1. Both general liability policies, and sixteen of the workers compensation policies, also named various UTC subsidiaries as additional named insureds. Id. at *1. A section governing the payment of retrospective premium obligated the "named insured" to pay the retrospective premium adjustments, if applicable. Id. More than twelve years after the period of coverage, MS/Essex Holdings ceased to be a subsidiary to UTC. Id. at *2. Although for some time UTC continued to make retrospective adjustment payments on claims attributable to Essex, it eventually refused to continue to do so. Id. at *3. The Court found that:

---

[5] In any event, even if the Court considered the course of the parties' conduct to define Zurich and Watts's intent at the time they signed the insurance contracts, the parol evidence would confirm the plain language. At no time in the fourteen years following the agreement did Zurich do anything other than present a unitary invoice to Watts, and at no point in that time period did Watts do anything other than pay on behalf of its subsidiaries without complaint.

unless there is something else in the Liberty Policies or some later modification thereof agreed to by Liberty, it is, as between Liberty and UTC, UTC that is liable for the premiums, including any retrospective premiums that may become due for claims that fall within the coverage of the Liberty Policies.

Id. at *4.

As was the case in Liberty, unless there is evidence of some later modification, Watts is liable to Zurich for the retrospective premium under the insurance contracts.

Modification, Novation or Waiver

Section VI of the RRA provides that:

this agreement and the policies to which this agreement applies constitute the entire contract between the insured and the company. The terms of this agreement and said policy shall not be waived or changed, except by written agreement of the insured and the company signed by their duly authorized representative.

Docket # 23-1 at 4.

Zurich denies having agreed in writing to any modification of the insurance contracts with respect to the retrospective premium adjustments here at issue. Watts has not produced any evidence to the contrary. Rather, Watts argues that the insurance contracts have been modified by the Parties' subsequent course of conduct.

A provision that an agreement may not be amended orally but only by a written instrument (such as the insurance contracts here at issue indisputably contain) does not necessarily bar oral modification of the contract. "Mutual agreement on modification of the requirement of a writing may . . . 'be inferred from the conduct of the parties and from the attendant circumstances' of the instant case." Cambridgeport Sav. Bank v. Boersner, 413 Mass. 432, 439 (1992) (quoting First Pa. Mortg. Trust v. Dorchester Sav. Bank, 395 Mass. 614, 625 (1985) (quoting Flynn v. Wallace, 359 Mass. 711, 715 (1971))). The evidence of a subsequent

oral modification, however, "must be of sufficient force to overcome the presumption that the integrated and complete agreement, which requires written consent to modification, expresses the intent of the parties." Id. at 439 n.10.

In First Pennsylvania Mortgage Trust (in which the Supreme Judicial Court found sufficient evidence of a subsequent oral modification of an integrated agreement which had required written consent for modification), there was "ample evidence" of numerous discussions between the parties and of written communications "setting forth the details of the new agreement and directing that the appropriate legal documentation be prepared." First Pa. Mortgage Trust, 395 Mass. at 622-23.

In contrast, in Cambridgeport, the plaintiff bank brought an action against guarantor defendants to collect on mortgage note. Cambridgeport, 413 Mass. at 433. The loan documents specified that the "Loan Agreement may not be modified or amended orally but only by a written instrument signed by Borrower and Lender." Id. at 434-35. The bank alleged that the note was in default because the borrowing trust had failed to make monthly interest payments as required by the note. Id. at 435. The guarantors took the position that the note was not in default because the loan transaction "included an agreement, not expressed anywhere in the loan documents, that the bank would disburse construction loan proceeds to the borrowers each month in an amount sufficient to allow them to meet their interest payment obligation." Id. Although the trial judge excluded parol evidence of the alleged agreement at the time of loan's execution to disburse construction loan proceeds, he nevertheless did allow the jury to consider whether "the parties had entered into a subsequent oral agreement, enforceable by its terms, to modify the contract to provide for interest funding by the bank, or on a theory that the bank had made a subsequent

promise to fund interest, on which the defendants had justifiably relied." Id. at 437. The jury returned a verdict in the defendants' favor, and the judge granted the bank's motion for judgment notwithstanding the verdict. Id. at 437-38.

The Supreme Judicial Court found that there was insufficient evidence of subsequent oral modification to sustain the jury's verdict where: (1) the defendants principally argued that the term sought to be located in a subsequent oral modification had in fact been a term of the original agreement; (2) a guarantor defendant, upon receiving the first interest bill and believing the interest "was taken care of" under the loan agreement, called a bank employee, who testified that she was instructed to inform the defendant to return to the bill to the bank and to pay the interest from remaining loan proceeds (which the bank did for the first four months); (3) the bank loan officer who negotiated the loan approved the disbursements to cover interest; and, (4) a loan status document included a calculation for the bank's payment of monthly interest. Id. at 441. The Court found that although the bank "ma[de] accommodations and grant[ed] indulgences" to the borrowers, these actions were "insufficient to warrant an inference . . . that the interest disbursements were the result of a post-closing agreement to modify the loan documents." Id. at 442 (citation omitted).

Watts's evidence of Zurich's agreement to subsequent oral modification is of two types.[6]

---

[6] The Court notes that within its opposition papers, Watts invoked as a basis for denial of Zurich's motion its need to conduct further discovery, citing Fed.R.Civ.P. 56(d) (formerly Fed.R.Civ.P. 56(f)), which permits the Court to deny a summary judgment motion, or to delay adjudication of the motion, when "a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition." Fed.R.Civ.P. 56(d). See Docket # 65 at 18 ff; Docket # 67 at ¶¶ 38 ff; Docket # 98-1 at 3. At the time Watts filed its opposition, discovery was set to conclude on December 31, 2011, and that deadline has since been extended to April 27, 2012. More than five months elapsed between Watts's filing of its opposition on September 16, 2011, and the February 29, 2012, hearing on Zurich's motion,

First, Watts points to Zurich's own conduct in: (1) failing to object when notified by Marsh employees (following the spinoff of Spence) that Watts and Spence/CIRCOR would need separate invoices and that each could only be responsible for its premium share; (2) defending CIRCOR (although not an additional named insured in the insurance contracts) for Spence asbestos claims; and (3) seeking payment for the seventeenth retrospective adjustment principally from CIRCOR.  Second, it points to the fact that Marsh signed the insurance contracts as Zurich's authorized representative,[7] and that Marsh (1) sought payment from CIRCOR on the disputed adjustments; and (2) instructed Watts not to pay the seventeenth adjustment.

The conduct of Zurich to which Watts points is insufficient to overcome the presumption that the insurance contracts reflect the intent of the parties and to establish subsequent modification.  As in Cambridgeport, Watts has principally argued (both in its dealings with

_____

during which time discovery continued.  Watts did in fact supplement its opposition with subsequently-discovered materials relating to its argument that the Parties' subsequent course of conduct evidences modification of the agreement, and argues that further discovery probative of the modification issue (in particular the depositions of Cameron and Amadeo) remains.  Docket # 98.  The relevant inquiry with regard to the fairness of resolving Zurich's motion without that evidence is whether or not there is a plausible basis for believing that such evidence, if adduced, will influence the outcome of the pending summary judgment motion.  The Court concludes that there is not such a basis.  Despite ample opportunity, Watts has not adduced any evidence within its own control (documentary or testimonial) concerning Watts's own role in the 1999 discussions with Marsh and/or Zurich concerning the effect of the spinoff on premium billing practices, nor of the subsequent mutual agreement supposedly reached thereby.  This is particularly striking in light of (1) Amadeo's statement that modification would require amendment of the agreements and discussions with Watts to produce "a meeting of the minds" and (2) the legal requirement of sufficient evidence to overcome the presumption that the integrated agreement is the complete agreement.

[7]  This is true only of the Declarations page of the Policy documents, and not of the portions of the insurance contracts which are specifically at issue here.  The PPA and RRA were signed by Robert Tinkham, an Assistant Vice President of Zurich.  See, Docket #s 67-1 at 2; 23-1 at 4, 9.

Zurich and CIRCOR, and in this litigation) that the Insurance Contracts themselves do not

obligate it to pay the post-spinoff adjustments. Moreover, the acts of Zurich (and principally of

Marsh) in pursuing payment from CIRCOR hardly manifest Zurich's intention to abandon its

contractual rights vis-a-vis Watts. Zurich's failure to object to Watts's position, or to Marsh's

course of conduct, is not tantamount to the written discussions evidencing mutual agreement

described in First Pennsylvania. Mortgage Trust (see supra, at 11). Rather, Marsh's actions are

analogous to the accommodations and indulgences which were granted to the borrowers in

Cambridgeport.[8] Notably absent from the record is evidence showing that either (1) Watts and

Zurich agreed, prior to the spinoff, to modify the written agreement and to obligate only Spence

to pay Spence-related premiums, or (2) after the spinoff, Watts, Spence and Zurich agreed to

make each insured responsible, only for its own share of premiums. Thus, for example, there is

no record evidence suggesting that CIRCOR has ever paid any retrospective premium attributable

to Spence.

 The same analysis which precludes a finding that Zurich agreed to a modification of the

contract also precludes a finding that the insurance contracts have been novated, or that Zurich

has waived its contractual rights. A defendant asserting novation as a defense bears the burden

---

 [8] Watts objects that the question of whether a contract has been modified is a fact question inappropriate for resolution on summary judgment. Ordinarily, this is so. However, the question presented here is not simply whether the evidence is sufficient to establish a modification, but rather whether the evidence is sufficient to overcome the presumption arising from the integration clause. In this case, Watts lacks sufficient evidence to meet this higher standard. See Cambridgeport, 413 Mass. at 438 n.9 (judge's decision to put the oral modification question to the jury rather than resolving it on directed verdict "may have been made in compliance with the recommended procedure in a case presenting a close question whether the standard for granting a directed verdict is met. In such circumstances, the judge should allow the matter to go to the jury, and then rule upon the issues presented, if it becomes necessary, in the context of a motion for judgment notwithstanding the verdict").

of proof in establishing its elements.  <u>Tudor Press v. Univ. Distrib. Co.</u>, 292 Mass. 339, 341 (1935).  Novation requires "not only  .  .  .  that there was an existing valid original obligation, but that there was an agreement of all parties to the new contract, the extinguishment of the old contract, and a valid new contract."  <u>Larson v. Jeffrey-Nichols Motor Co.</u>, 279 Mass. 362, 366 (1932).  Here, Watts cannot demonstrate that Zurich and CIRCOR have agreed to relieve Watts of its obligations under the insurance contracts.

Similarly, the fact that Zurich attempted to collect from CIRCOR does not waive Zurich's right to collect premium from Watts under the terms of the insurance contract.  <u>See</u>, <u>e.g.</u>, <u>American Mutual Liability Ins. Co. v. Bollinger Corp.</u>, 402 F.Supp. 1179, 1181 (W.D.Pa.1975) (citing Restatement, Contracts Sec. 160(3) (4)) (the fact that plaintiff insurer was willing to accept payment of defendant's past due premium incurred on behalf of former subsidiary directly from the former subsidiary did not establish creditor/debtor relationship with former subsidiary and did not extinguish defendant's debt to plaintiff).   As noted previously, the question of whether Watts and CIRCOR may have allocated responsibility for the premium between themselves during the spinoff transaction is the subject of a pending arbitration.  But the question there considered is extrinsic to the issue here presented – <u>i.e.</u>, Watt's contractual obligations to Zurich.

Accordingly, I RECOMMEND that Zurich's Motion for Partial Summary Judgment (Docket # 49) be ALLOWED.

<u>Joint and Several Liability</u>

A second argument advanced by Zurich (namely, that Watts could also be liable to it under the insurance contracts because both Watts and CIRCOR are jointly and severally liable) nevertheless remains to be considered.

Zurich argues that Watts and CIRCOR are jointly and severally liable for the retrospective premium because the insurance contracts at issue identify both Spence and Watts as the named insureds, and obligate the named insureds to pay premium, and also because as a principle of law, wherever there is one unitary policy and premium (as there undoubtedly are in the insurance contracts at issue) then all of the named insureds are jointly and severally liable for premium. <u>See</u> Docket # 116 at 10 (and cases cited therein).

The Court is not persuaded that the insurance contracts themselves unambiguously create joint and several liability. While the Policy documents identify Spence, among other entities, as being one of the named insureds, the PPA contemplates payment only by Watts. Watts is defined as the "you" which is obligated by the PPA to meet all of the premium obligations in the first five and one-half years of the insurance contracts, without reference to any of the subsidiaries. Docket # 23-1 at 6-9. In the RRA, although Watts acts "on its own and on behalf of its subsidiaries and affiliated companies," the Agreement itself is nevertheless one "entered into by Watts" . . . "and Zurich."[9]

Nor is the Court persuaded, by the selection of cases cited from (primarily) trial courts in other jurisdictions, that a rule of Massachusetts law compels the finding that a unitary policy with a unitary premium scheme necessarily creates joint and several liability. The cases cited by Zurich do not provide unequivocal support for the blanket proposition urged by it, but rather turn to a large degree upon the language of the policies at issue and upon the particular circumstances of the ownership of the corporate entities insured thereby and of the policies' procurement. For

---

[9] Contrast with the situation in <u>Comm'rs of the State Ins. Fund v. Allied Renovation Corp.</u>, 2009 WL 2459851 (N.Y. Sup.), <u>infra</u>, in which the policy unambiguously stated that the insureds were jointly and severally liable for all premium.

example, in <u>Comm'rs of the State Ins. Fund v. Allied Renovation Corp.</u>, 2009 WL 2459851 (N.Y. Sup.), the insurance contract at issue had explicitly provided that "you are liable jointly and severally with all other insureds for all premiums allocable for the period of time you are insured." <u>Id.</u> at *5.[10]

Moreover, in the most closely analogous Massachusetts case, <u>Liberty</u> (<u>see</u> discussion <u>supra</u> at 9-10), the Court found that there was no joint and several liability, despite the existence of a unitary policy and a unitary premium scheme, and where (as the Court has already found with respect to the insurance contracts here at issue) the policy unambiguously identified the parent corporation as the party liable under the plain language of the insurance contract. <u>Liberty</u>, 2003 WL 369673 at *5-6.

Given that the contract does not unambiguously create joint and several liability, and that no rule of law compels that result, it remains to consider whether a reasonable jury might conclude that the intent of the Parties at the time of the formation of the insurance contracts was to create such liability. There is here a complete dearth of evidence suggesting that this was the Parties' intent. Nothing in the record evidence concerning the Parties' fifteen-year course of conduct prior to the 1999 spinoff of Spence suggests that any entity other than Watts was ever intended to meet the premium obligations under the policy, despite the subsidiaries' presence on the policies as named insureds. As the RRA and PPA clearly recite, Watts entered into a contract

---

[10] While the case does include the assertion that "caselaw provides that when there is only one policy and one premium, as is here, all of the named insureds on a policy of insurance are jointly and severally liable for the premiums" (citing <u>Comm'rs of State Ins. Fund v Gem Steel Erectors Inc.</u>, 237 AD2d 213, 214, 1997 NY Slip Op 02805), the case cited does not unambiguously support the quotation. It merely recites without elaboration or explanation that the documentation submitted in that case established that each entity was jointly and severally liable.

with Zurich, albeit one intended to benefit its subsidiaries.

**CIRCOR's Motions**

<u>CIRCOR's First Motion for Summary Judgment</u> (Docket # 74)

On October 1, 2011, CIRCOR moved for summary judgment on the basis that Zurich's claims are barred because it agreed in the RRA not to collect any retrospective premium after the Fifth Retrospective Premium Adjustment, in or about 1991. Docket # 75. This argument is not persuasive because: first, the contractual language supports Zurich's interpretation; second, to the extent that the contractual language is ambiguous, the Parties' subsequent conduct at least creates a genuine dispute of material fact as to the meaning of the termination provision at issue; and, third, because the unrebutted record evidence supports Zurich's interpretation.

The PPA states in relevant part, in a section titled "Termination," that

> [t]his Agreement shall terminate and all premiums due under the provisions of the policies and Retrospective Premium Agreement <u>included in this Agreement</u> shall become due immediately:
>
> .   .   .
>
> 5. At the time of the Fifth Retrospective Premium Adjustment for the Policies subject to this Agreement.

Docket # 23-1 at 7-8 (emphasis added).

Section IV of the RRA provides that Zurich is to make the first computation of retrospective premium, valued as of six months after the termination of the policy period (<u>i.e.</u>, as of December 31, 1986) as soon as practicable following that valuation date, and every twelve months thereafter. Docket # 23-1 at 3. Thus, under CIRCOR's reading of the insurance contracts, the insureds were liable to pay retrospective premium adjustments only for approximately five and one-half years. <u>See</u> Docket # 76 at 5-6.

Zurich responds first that the plain language of the contract belies CIRCOR's interpretation because the termination date cited by CIRCOR in its motion is contained only in the PPA, which concerns Watts's initial payment and security obligations, and not in the RRA, which sets forth the Parties' obligations with respect to retrospective premiums (and which indisputably contains no termination date). Docket # 84 at 7 ff.

Second, Zurich argues that the interpretation of the insurance contracts offered by CIRCOR is contradicted by the Parties' entire course of conduct, in that Watts continued to pay retrospective premium for ten years beyond the termination date advanced by CIRCOR and never asserted that termination date as a reason to refuse payment. Watts's course of conduct, it argues, acts both to illustrate the intent of the Parties that the retrospective premium obligation continued and also acts as a waiver of the position asserted by CIRCOR.

As noted previously, the interpretation of an unambiguous agreement or policy presents an issue of law for the Court's determination. 116 Commonwealth, 433 Mass. at 376; see supra at 7-8. "The object of the court is to construe the [policy] as a whole, in a reasonable and practical way, consistent with its language, background and purpose." USM Corp. v. Arthur D. Little Sys, Inc., 28 Mass.App.Ct. 108, 116 (1989). The Court must act in a way to give effect to the policy as a rational business instrument in order to carry out the intent of the parties. Starr v. Fordham, 420 Mass. 178, 192 (1990). Justice, common sense and the probable intention of the parties upon consideration of the words in question are guides to the construction of a written contract. City of Haverhill v. George Brox, Inc., 47 Mass.App.Ct. 717, 720 (1999). Even in the case of an ambiguous agreement, interpretation is a matter of law for the Court except insofar as it may turn on facts in genuine dispute. Gross v. Prudential Ins. Co. of Am., Inc., 48 Mass.App.Ct. 115, 119

(1999).

The Court is not persuaded that the plain language of the agreements supports CIRCOR's reading of the termination provisions. Clearly, the PPA terminates after five and one-half years. The RRA, however, plainly contains no termination provision. CIRCOR points in particular to the phrase, "[t]his Agreement shall terminate and <u>all premiums due under the Provisions of the Policies and Retrospective Premium Agreement</u> included in this Agreement shall become due immediately," (emphasis added) as meaning that all premium, whether calculated under either the PPA and the RRA, is due at the time of the Fifth Retrospective Adjustment. This interpretation, however, makes superfluous not only the phrase "included in this Agreement" which immediately follows. The PPA itself contemplates retrospective premium payments made according to the formula contained in the RRA, and this is the plain meaning of "premiums due under the Provisions of the . . . Retrospective Premium Agreement included in this Agreement." CIRCOR's reading would also render the RRA itself superfluous.

To the extent that the termination language is at all ambiguous, Watts's undisputed subsequent course of conduct in paying retrospective premium for an additional ten years following the date of termination here urged by CIRCOR is of great significance. At no point did Watts ever object to paying premium beyond the Fifth Retrospective Adjustment on the basis that the contract had terminated as described by CIRCOR. If Watts had believed at the time it entered into the insurance contracts that no further premium was to be due after five and one-half years, it is extremely unlikely that it would have continued to pay premium for an additional ten years thereafter. This evidence is undisputed.

Moreover, the unrebutted record evidence supports Zurich's interpretation. Its affiant

Robert Tinkham was involved in drafting the PPA and was also Zurich's signator for both the PPA and the RRA. Docket # 87-1 at ¶ 5. Tinkham affirms that the PPA and the RRA were created from form template agreements typical of many of the retrospectively-rated agreements then in use by Zurich. Id. at ¶ 6. He further affirms that the PPA and RRA "structured the parties' retrospective premium obligations into two parts. The first is described in the PPA, which was designed to be in effect for only first five and one-half years of the insurance program. The second part is the RRA, which was designed to continue . . . indefinitely, until the parties agreed that retrospective premium adjustments were no longer necessary." Id. at ¶ 8. The PPA, he affirms, was designed to secure Watts's obligations to Zurich (via, inter alia, frequent premium payments and posting of a letter of credit) "during the period of time when the claims experience is most volatile." Id. at ¶ 9. The RRA applied to the period in which less volatile claims activity was expected and therefore provided for annual (rather than quarterly) computations of retrospective premium based on a specified formula. Id. at ¶ 11. Tinkham's testimony is unrebutted. CIRCOR is able to offer no evidence suggesting that Watts had a different interpretation of the insurance contracts at the time of their execution. I therefore RECOMMEND that the Court deny CIRCOR's First Motion for Summary Judgment (Docket # 74).

      CIRCOR's Second Motion for Summary Judgment (Docket # 100)

      On January 18, 2012, CIRCOR filed a Second Motion for Summary Judgment. Docket # 100.[11] The bases of CIRCOR's second motion are: (1) that Watts and Zurich (and not

---

[11] As a threshold matter, CIRCOR neither obtained nor sought permission from the Court to file a second summary judgment motion. Fed. R. Civ. P. 56 does not place any limit upon the number of motions which may be filed pursuant to that rule. Although the First Circuit appears

Spence/CIRCOR) are parties to the insurance contracts; (2) that by their terms, those contracts (which have not been modified or novated) obligate Watts to pay the retrospective premiums; and (3) that CIRCOR is not otherwise obligated to Zurich for retrospective premium.

For the reasons described above with respect to Zurich's motion, the Court agrees with each of the arguments advanced by CIRCOR. I therefore RECOMMEND that the Court ALLOW CIRCOR's Second Motion for Summary Judgment (Docket # 100).

---

not to have addressed the issue directly, at least six circuits have held that district courts have discretion to permit successive motions for summary judgment. See, Hoffman v. Tonnemacher, 595 F.3d 908, 911 (9th Cir.2010) (collecting cases). Moreover, in F.D.I.C. v. Kooyomjian, 220 F.3d. 10, 16 (1st Cir.2000), the First Circuit affirmed a district court's exercise of discretion to consider a fourth motion for summary judgment where it "reflected material changes in the posture of this litigation and was grounded on meritorious contentions." Id. It is thus within the Court's discretion to consider a second motion, and I recommend that the Court reach the merits of CIRCOR's second motion. Importantly, CIRCOR's first motion remained pending at the time that the second motion was filed, and so the second motion might fairly be seen as merely articulating additional grounds for relief. In that case, however, CIRCOR will have filed thirty-six pages of memoranda in support of its motion, in violation of L.R. 7.1(B)(4), which limits memoranda in support of motions to twenty pages, without leave of court. The better practice would be for the party filing successive Rule 56 motions to seek the Court's permission before filing one.

III.    CONCLUSION

For the foregoing reasons, I RECOMMEND that the Court ALLOW Zurich's Motion for

Partial Summary Judgment (Docket # 49),  DENY CIRCOR's First Motion for Summary

Judgment (Docket # 74) and ALLOW CIRCOR's Second Motion for Summary Judgment

(Docket # 100).  I further RECOMMEND that following the Court's resolution of these motions,

it direct the Parties to file a Joint Status Report within ten days outlining a proposed schedule for

the remainder of the case and then convene (or refer to the undersigned to convene) a Status

Conference for the purpose of setting a schedule for disposition of the case.[12]

        /s / Leo T. Sorokin
        UNITED STATES MAGISTRATE JUDGE

---

[12]  The parties are hereby advised that any party who objects to these proposed findings
and recommendations must file a written objection thereto within 14 days of receipt of this
Report and Recommendation.  The written objections must identify with specificity the portion
of the proposed findings, recommendations, or report to which objection is made, and the basis
for such objections.  See Fed. R. Civ. P. 72 and Habeas Corpus Rule 8(b).  The parties are further
advised that the United States Court of Appeals for this Circuit has repeatedly indicated that
failure to comply with Rule 72(b) will preclude further appellate review of the District Court's
order based on this Report and Recommendation.  See Keating v. Secretary of Health & Human
Servs., 848 F.2d 271 (1st Cir.1988); United States v. Emiliano Valencia-Copete, 792 F.2d 4 (1st
Cir.1986); Park Motor Mart, Inc. v. Ford Motor Co., 616 F.2d 603 (1st Cir.1980); United States
v. Vega, 678 F.2d 376, 378-379 (1st Cir.1982); Scott v. Schweiker, 702 F.2d 13, 14 (1st
Cir.1983); see also Thomas v. Arn, 474 U.S. 140, 106 S.Ct. 466 (1985).