UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾ ) | |
| ZURICH AMERICAN INS. CO., et al., ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | Civil Action No. 10-11190-NMG |
| ) | |
| WATTS REGULATOR CO., et al., ) | |
| ) | |
| Defendants. ) | |
| ‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾) | |

REPORT AND RECOMMENDATION ON
MOTIONS FOR SUMMARY JUDGMENT

March 21, 2013

SOROKIN, C.M.J.

Pending are: the Plaintiff Zurich's Motion for Summary Judgment (Docket # 157);

Defendant Watt's Motion for Partial Summary Judgment with Respect to the 16th, 17th and 20th

Adjustments (Docket # 168); and, Watts's Motion for Partial Summary Judgment with Respect

to Zurich's Failure to Mitigate Damages (Docket # 172).[1]

For the following reasons, I RECOMMEND that the Court ALLOW Zurich's motion IN

PART and DENY it IN PART.  I further RECOMMEND that the Court ALLOW IN PART

Watt's Motion with respect to the 16th, 17th and 20th Adjustments and DENY IT IN PART and

that the Court DENY Watts's motion with respect to Zurich's failure to mitigate damages.

_____

[1] Also pending are several non-dispositive motions which are the subject of a separate
Order issued on this date.

1

I.      STATEMENT OF FACTS[2]

Zurich issued insurance policies to Watts for the policy year spanning June 30, 1985 to June 30, 1986, which included a commercial general liability policy.  Docket # 170 at ¶ 1.  In connection with this policy, Watts and Zurich also entered into a retrospective premium agreement.  Id. at ¶ 2.  The Retrospective Rating Agreement required Zurich to perform annual adjustments based on "incurred losses," a term that included both actual losses, attorneys' fees and reserves for claims known but not yet settled.  Id. at ¶ 3.  If total incurred losses had increased during the year, Zurich was to invoice Watts for additional amounts at the end of the year.  Id. at ¶ 4.  If total incurred losses decreased during the year, then Zurich was to provide a credit to Watts at the end of the year.  Id.  Zurich issued retrospective premium adjustments upon the conclusion of every calendar year from 1986 through 2004, when Zurich issued the 19th adjustment.  Id. at ¶ 9.  The maximum retrospective premium that Watts could owe to Zurich was $1,771,377.  Id. at ¶ 11. The amount in dispute in this action (excluding interest), is $815,185; i.e., the sum of the amounts billed in the 16th, 17th, 19th and 20th Adjustments.  Id. at ¶ 12.

II. DISCUSSION

Applicable Standard of Review

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P.  56(a).   Once a party has properly supported its motion for summary judgment, the

---

[2]  Additional facts relevant to consideration of particular motions are recited as necessary, infra.

burden shifts to the non-moving party, who "may not rest on mere allegations or denials of his pleading, but must set forth specific facts showing there is a genuine issue for trial." <u>Barbour v. Dynamics Research Corp.</u>, 63 F.3d 32, 37 (1st Cir.1995)(quoting <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 256 (1986)).  Moreover, the Court  is "obliged to view the record in the light most favorable to the nonmoving party, and to draw all reasonable inferences in the nonmoving party's favor."  <u>LeBlanc v. Great American Ins. Co.</u>, 6 F.3d 836, 841 (1st Cir.1993).  Even so, the Court is to ignore "conclusory allegations, improbable inferences, and unsupported speculation." <u>Sullivan v. City of Springfield</u>, 561 F.3d 7, 14 (1st Cir.2009).

### <u>Watts's Motion for Partial Summary Judgment With Respect To 16th, 17th and 20th Adjustments</u>

Watts moves for Partial Summary Judgment with respect to three of the four invoices at issue in the case.  Docket # 168.

#### <u>The 16th Adjustment</u>

On January 29, 2002, Zurich issued the 16th Adjustment reflecting incurred losses during 2001. Docket # 170 at ¶ 13.  The invoice demanded payment of $6,214 by February 18, 2002. <u>Id.</u>  Most of this amount was attributable to a reserve set by Zurich for a civil action.  <u>Id.</u> at ¶ 14. Watts received the 16th adjustment from Marsh on August 14, 2002, by which time Watts had learned that the civil case in question had already been dismissed.  <u>Id.</u> at ¶ 15.  Watts objected to payment on the basis that an open reserve on a closed case was unnecessary.  <u>Id.</u> at ¶ 16.  Watts informed Marsh of its objection, and Marsh informed Zurich.  <u>Id.</u> at ¶ 17.  Marsh instructed Watts not to pay the invoice, and Zurich removed the reserve from its books.  <u>Id.</u> at ¶¶ 18-19. Zurich took the position at that time that (although it did not express this to Watts) that Marsh had incorrectly instructed Watts not to pay the 16th Adjustment.  <u>Id.</u> at ¶ 25. As a result, a

revised 17th Adjustment was issued on March 6, 2003, in which Watts billed the amount of 17th Adjustment combined with the 16th Adjustment.  Id. at ¶ 24.  Payment was due under that invoice on March 27, 2003.  (Zurich facts, ¶ 65)

On October 21, 2008, the Parties entered into a standstill agreement with respect to Zurich's claims in this case, which preserved time-bar defenses.  Id. at ¶ 20; Docket #222-5. This action was filed on July 16, 2010.  Id. at ¶ 21.

Watts argues that Zurich's claim for breach with respect to the 16th adjustment is time-barred because the applicable statute of limitations for contract actions is six years (see M.G.L. c. 260, § 2), the date of the breach was the due date of the 16th adjustment (i.e., February 18, 2002), and the Standstill Agreement was executed more than six years following the breach. Docket # 169 at 4-5.  In general, a cause of action for breach of contract accrues at the time of the breach.  Berkshire Mutual Insurance Co. v. Burbank, 422 Mass. 659, 661 (1996).  Here, the breach alleged by Zurich is a failure to pay retrospective premium, which occurred when Watts failed to pay the 16th Adjustment by the due date of February 18, 2002.

Zurich argues that while the invoice for the 16th Adjustment was indeed first presented on January 29, 2002, it was also re-billed by Zurich a year later, and that a breach based upon a failure to pay that invoice would not be time-barred.  But, the statute of limitations in contract actions arises when the breach first occurred.  The breach, in this case, is the failure or refusal to pay the amount due and owing under the contract as reflected in the 16th Adjustment.   That claim arose when the bill become due and owing.  Issuing another bill for the same amounts due and owing under the contract neither reset the statute of limitations nor gave rise to a new claim.

I therefore RECOMMEND that the Court ALLOW Watts's motion with respect to the 16th Adjustment (and, for the same reasons, it should ALLOW the motion with respect to that portion of the re-billed 17th Adjustment which, as explained _infra_, represented the identical charges).

The 17th Adjustment

On January 17, 2003, Zurich issued the 17th Adjustment invoice, seeking payment of $108, 292.00 by March 26, 2003.  Docket # 170 at ¶ 22.  The 17th Adjustment was subsequently revised to add the amount from the unpaid 16th Adjustment.  Id. at ¶¶ 23-24.

On or before April 14, 2003, Watts informed Zurich (through Marsh) that the 17th Adjustment was the responsibility of CIRCOR.  Id. at ¶ 27-28.  On April 30, 2003, Marsh wrote to Watts and informed Watts that it was not responsible for the 17th Adjustment (other than the $6,214 carried over from the 16th Adjustment).  Id. at ¶ 28.  March also issued a credit memo which included the instruction, "DO NOT PAY." (emphasis in original)  Id. at ¶ 29.  Zurich objected to Marsh's handling of the invoice, but neither Zurich nor Marsh communicated with Watts about it further until 2008.  Id., at ¶¶ 30, 38-39.  Zurich's internal correspondence continued to reflect that the 17th Adjustment was unpaid.  Id. at ¶ 37.  Until some point in 2005, Zurich had  attempted to collect the 17th Adjustment from CIRCOR.  Id. at ¶ 42.

Watts argues that Zurich has waived, and is estopped from asserting, its right to collect the 17th Adjustment because Watts relied upon Marsh's "Do Not Pay" memo.  It asserts that, "Zurich's undisputed actions manifested an intent to relinquish its right to payment from Watts for the full 17th Adjustment."  Docket # 169 at 9.

"Waiver may occur by an express and affirmative act, or may be inferred by a party's

conduct, where the conduct is 'consistent with and indicative of an intent to relinquish voluntarily a particular right [such] that no other reasonable explanation of [the] conduct is possible.'  KACT, Inc. v. Rubin, 62 Mass.App.Ct. 689, 695 (2004) (quoting Attorney Gen. v. Industrial Natl. Bank, 380 Mass. 533, 536 n. 4 (1980)).

"Circumstances that may give rise to an estoppel are (1) a representation intended to induce reliance on the part of a person to whom the representation is made; (2) an act or omission by that person in reasonable reliance on the representation; and (3) detriment as a consequence of the act or omission." Anzalone v. Admin. Office of the Trial Court, 457 Mass. 647, 661 (2010) (quoting Sullivan v. Chief Justice for Admin. & Mgt. of the Trial Court, 448 Mass. 15, 27–28, (2006)).

Watts asserts that "there is no other reasonable interpretation of Zurich's actions except that it had waived its right to collect the 17th Adjustment from Watts."  Docket # 16 at 10.   The evidence produced by Watts is insufficient to support that conclusion, especially when drawing all reasonable inferences in Zurich's favor as the Court must when considering Watts's motion.

Another reasonable interpretation of Zurich's actions is that Zurich was willing to attempt to collect from CIRCOR, while still maintaining its right to collect from Watts should that effort fail.  Such a course of action would be manifestly reasonable.  And, the Court has found that such an approach is legally tenable.  See Docket # 136 at 3 ("Zurich's attempt to facilitate the spinoff by dividing premium invoices among the defendants did not release Watts from its obligation to make the payments under the contracts").  Moreover, in the Report and Recommendation (Docket # 125) which the Court adopted (Docket # 136), the undersigned (after considering all of the same arguments here advanced by Watts) concluded not only that

Zurich and Watts had not modified the contract, but also that Zurich had not waived its rights. Docket # 125 at 14-15.  Watts has not advanced any arguments warranting reconsideration of that prior decision.

More importantly, Marsh was Watts's agent, and given that Zurich had informed Marsh that it objected to its handling of the invoice, Watts was on notice that Zurich had not waived its right to payment of the 17th Adjustment.  Although Watts's counsel argued at the March 8, 2013 hearing of this matter that by statute, Marsh was Zurich's agent rather than Marsh's for purposes of the delivery of invoices, counsel did not specify the applicable statute, nor does Watts's briefing refer to it.  Zurich responds that under Massachusetts law, a broker such as Marsh is ordinarily the agent of the insured and it cites a case in which the court looked to four factors including (1) who called the agent to the transaction, (2) who controlled his actions, (3) who paid him, and (4) whose interests he attempted to protect.  Docket # 227 at 14 (citing Foisy v. Royal Maccabees Life Ins. Co. , 356 F.3d 141, 149-50 (1st Cir. 2004)).  A Marsh employee deposed in this case testified that Watts retained Marsh, that Marsh negotiated with Zurich on Watts's behalf, and that Marsh reviewed the adjustment invoices on Watts's behalf.   See Docket # 225-11 at 4-14.  There is no other evidence before the Court on this point.[3]

With respect to promissory estoppel, this argument was also previously considered and rejected by the Court.  Although refocused here on the single adjustment, it fails for at least two reasons.  Watts could not reasonably rely, for purposes of an estoppel, on the "do not pay"

---

[3]  Although the Court referred to Marsh in passing as "Zurich's agent" in its Report and Recommendation on the previous motions (see Docket # 125 at 3, citing to the Amended Complaint for the fact of the provision of invoices), that issue was not before the Court at that time and was not decided by this characterization.

statement.  The undisputed evidence establishes that the statement was Marsh's  – i.e., that of

Watts's agent rather than Zurich's. See, e.g., Docket # 171-8 at ¶ 5 ("After I [i.e., Watts's

Corporate Benefits and Risk Manager] informed Mr. Reid [of Marsh] that I did not believe Watts

owed the amount set forth in the 17th Adjustment, he agreed with me and instructed me not to

pay it").  Moreover, in the face of the evidence that Zurich notified Marsh of its objection to

Marsh's handling of the invoice, Watts, as a matter of law, cannot rely upon the "do not pay"

statement for purposes of an estoppel asserted against Zurich.  Second, Watts has no reasonable

expectation of proving an element of the claim, that it suffered a detriment as a consequence of

reliance upon the 'do not pay' instruction – rather, it received a benefit thereby (the use of the

disputed funds) while Zurich pursued CIRCOR.

I therefore RECOMMEND that the Court DENY the motion with respect to the 17th

Adjustment.

The 20th Adjustment

The parties dispute whether or not the contract imposed a condition precedent of an

annual bill such that the failure to bill annually (as occurred between 2005-2009) bars Zurich's

claim for the 20th adjustment issued in 2009.  Section IV of the Retrospective Rating Agreement

(RRA) provided in relevant part that:

(B)     THE COMPANY SHALL COMPUTE THE EARNED RETROSPECTIVE
        PREMIUM BASED UPON INCURRED LOSSES VALUED AS OF THE DATE
        SIX MONTHS AFTER TERMINATION OF THE POLICIES AS SOON AS
        PRACTICABLE AFTER SUCH VALUATION DATE.  SUBSEQUENT
        COMPUTATIONS OF THE EARNED RETROSPECTIVE PREMIUMS SHALL
        BE MADE AT INTERVALS OF TWELVE MONTHS.  FURTHER
        COMPUTATIONS OF THE EARNED RETROSPECTIVE PREMIUM SHALL
        BE COMPUTED AS REQUESTED BY THE INSURED OR THE COMPANY.

(C)     IF AN EARNED RETROSPECTIVE PREMIUM IS GREATER THAN THE

PREMIUM SUBJECT TO RETROSPECTIVE RATING PREVIOUSLY PAID
TO THE COMPANY, THE INSURED SHALL PAY THE DIFFERENCE TO
THE COMPANY; IF LESS, THE COMPANY SHALL REFUND THE
DIFFERENCE TO THE INSURED.

Docket # 23-1 at 3

Zurich issued the 1st Adjustment on December 31, 1986, six months after the end of the

policy term.  Docket # 170 at ¶ 45.  It then issued annual adjustments until the 19th adjustment at

the end of 2004.  Id.  The 20th Adjustment (for incurred losses over the prior four years) was

issued in 2009.  Id. at ¶ 46.   Although reserves had increased by more than $4 million during

that period, only the first $194,011 could be billed to Watts because of the maximum

retrospective premium provided for in the contract.  Id. at ¶¶ 49-50.

Watts argues that it is not obligated to pay the 20th Adjustment because Zurich's timely

issuance of an adjustment was a condition precedent to Watts's obligation to pay.

It is well established that "[a] condition precedent is an act which must occur before

performance by the other party is due." Superior Mechanical Plumbing & Heating, Inc. v.

Insurance Co. of West, 81 Mass.App.Ct. 584, 590 (2012) quoting (Wood v. Roy Lapidus, Inc.,

10 Mass.App.Ct. 761, 763 n. 5 (1980)). "If the condition is not fulfilled, the contract, or the

obligations attached to the condition, may not be enforced." Id. (quoting Massachusetts Mun.

Wholesale Elec. Co. v. Danvers, 411 Mass. 39, 45, (1991)).  In construing a contract, the court

looks to the Parties' intent to determine whether they have created a condition precedent.

Massachusetts Mun., 411 Mass. 39 at 45.  Intent may be ascertained by considering the words

used by the Parties, the agreement taken as a whole, and surrounding facts and circumstances.

Id. at 46.

"Generally, quite emphatic words are necessary to create a condition precedent to the

maturing of rights under a contract, or the forfeiture of rights." Thomas v. Massachusetts Bay Transp. Authy., 39 Mass.App.Ct. 537, 543 (1995).   For example, "the phrase 'if and when,' but not 'when' alone, creates a condition precedent." Massachusetts Mun. Wholesale Elec. Co. v. Danvers, 411 Mass. 39, 46 (1991).

Emphatic or precise words are not absolutely necessary to create a condition. See 5 Williston, supra at § 671. In the absence of the usual words, a condition precedent may nonetheless be found to exist if the intent of the parties to create one is clearly manifested in the contract as a whole.

For example, in Superior, the relevant provision provided that "[n]otwithstanding any other provisions of the Agreement, Owner shall not be obligated to make any payment to Contractor if, and as long as, any one or more of the following conditions exist:  . . .  Contractor has failed to furnish to Owner satisfactory proof of payment to its subcontractors and suppliers and/or lien waivers and releases in the form and manner required hereunder." Id.

Here, the RRA billing paragraph, subparagraph (B), contains no emphatic words.  Thus, it does not create a condition precedent.  The emphatic word in subparagraph (C) "If", does create a condition precedent, that the adjustment must reveal one party owes the other under the contract before an obligation to pay is triggered.  This "if" phrase, however, does not condition the payment obligation upon receipt of any annual bill.   Moreover, the contract as a whole does not clearly manifest an intent to create a condition precedent excusing Watts from paying retroactive premium owed if not billed annually.

Moreover, Watts has no evidence that any breach of the annual billing provision of the RRA was a material breach.  No harm flowed to Watts as a result of Zurich not having billed the

retrospective premium annually, since interest did not accrue until the invoice issued.  Although Watts's affiant identifies certain harms (e.g., that she was unable to monitor claims or make reports to outside auditors in the absence of the annual invoices, that internal budgets were impacted) (see Docket #171-8 at ¶¶ 11-15), the same affiant (who was Watts's 30(b)(6) designee with respect to the 20th Adjustment) previously disclaimed under oath personal knowledge of any harm to Watts as a result of the delay in billing the 20th Adjustment.  See Docket # 223 at ¶ 54 (citing Docket # 222-2 at 3).  The Court need not rely upon an affidavit at summary judgment which is contradicted by previous sworn testimony.  See, e.g., Thore v. Howe, 466 F.3d. 173, 186 n. 7 (2006) ("here a witness gives a clear and unambiguous answer, he may not defeat summary judgment with a contradictory affidavit unless he gives a satisfactory explanation of why the testimony has changed").[4]  Other reasons why the delay might have harmed Watts do not appear in the record to have come to fruition.  For example, Prokop affirms that annual adjustments permitted Watts to review the adjustments for errors, which often led to corrections in Watts's favor.   Docket # 171-8 at ¶ 12.  But there is no indication in the record that Watts discovered such errors with respect to the 20th Adjustment when billed.  Nor has Watts submitted evidence beyond mere conclusory assertions that it might have earlier identified errors (but cannot now) due to the delay.

I therefore RECOMMEND that the Court DENY Watts's motion with respect to the 20th Adjustment.

---

[4]  Although the cases typically concern parties attempting to defeat summary judgment by creating a disputed issue of material fact by affidavit, the argument applies with equal (if not greater) force to such an attempt by a movant.

## **Watts's Motion for Partial Summary Judgment for Failure to Mitigate**

Watts also moves for partial summary judgment with respect to Zurich's claims for prejudgment interest because Zurich failed to mitigate its damages when it chose not to recoup unpaid amounts from posted collateral.  Docket # 172.

Pursuant to the 1985-86 PPA, Watts was required to deliver to Zurich a "Clean Irrevocable Letter of Credit" in a form and in an amount required by Zurich.  Docket # 174 at ¶ 5. The PPA also gave to Zurich the right to draw on the posted LOC in order to collect any amounts Zurich claimed were outstanding.  Id. at ¶ 6.  Watts secured such a letter of credit as required under the contract.  Id. at ¶¶ 8, 13-19.  As the Court previously determined, the PPA terminated in 1991.  See Docket # 125 at 20; Docket # 136.  This terminated Watts's obligation under the PPA to provide a letter of credit and the letter of credit was returned.   See Docket # 225-8.

In 1995, Watts and Zurich entered into a new, separate insurance contract.  Docket # 225-9.  This contract required Watts to provide a letter of credit.  Id. at 4.  Watts provided a letter of credit as required.  Although the terms of the letter of credit itself did not limit its use to the contract entered into in 1995, that contract itself specified that Zurich was permitted to draw on the letter of credit in order to, inter alia "pay any sum under this Agreement which is beyond its due date."  Id. at 5 (emphasis added).  At all times since 1995, Watts has maintained a letter of credit in favor of Zurich.  Docket # 125 at ¶ 24.

The first asbestos lawsuit naming Watts as a defendant (thus triggering possible obligations under the 1985-1986 PPA) was tendered to Zurich under the 1985-86 policy on April 24, 2001.  Id. at ¶ 23.

Zurich threatened in reminder letters concerning amounts owed under the contract at issue

in this case that it would draw on letters of credit to satisfy the amounts due.  Id. at ¶ 32.  Zurich

nevertheless did not draw on letters of credit to satisfy the amounts here at issue.  Id. at ¶ 34.

Watts asserts that as a matter of law, Zurich is precluded from recovering prejudgment

interest because of its failure to mitigate its damages by exercising its right to draw from the letter

of credit.  Docket # 173.  Had Zurich done so, it argues, no interest would have accrued and the

interest it now seeks to recover would constitute a windfall brought about by its own self-serving

inaction.  Id.

First, Watts has not established that there was a letter of credit in place upon which Zurich

could have drawn.  The letter of credit which Watts references as having been in place

continuously between 1995 and this date is with respect to policy years not here at issue.  Zurich

argues persuasively that to draw down a letter of credit securing a different policy year would

have violated both the contract giving rise to the letter of credit and the applicable law.  See

Docket # 224 at 8-9 (citing Allsup's Convenience Stores, Inc. v. N. River Ins. Co. , 976 P.2d 1,

16-19 (N.M. 1998) (jury's finding of bad faith and award of punitive damages justified where

defendant drew down letter of credit to cover unpaid retrospective premium due under separate

earlier policy)).

Second, the duty to mitigate is the duty to mitigate one's "damages."  See Global

Investors Agent Corp. v. National Fire Ins. Co. of Hartford, 76 Mass.App.Ct. 812, 825 (2010)

(quoting Burnham v. Mark IV Homes, Inc., 387 Mass. 575, 586 (1982) ("[a] plaintiff may not

recover for damages that were avoidable by the use of reasonable precautions on his part"))

(emphasis added).  Interest is not a form of damages, but rather is something added to the

damages as a matter of law.  Watts has not cited persuasive authority for the proposition that as a

matter of law, Zurich may not recover its interest.  In the case upon which Watts principally relies

(Newcastle Properties, Inc. v. Shalowitz, 221 Ill.App.3d 716 (1991)), the issue was whether

liquidated damages could have been mitigated by means of drawing down a letter of credit, and

thus were available or not as category of damages available for recovery.   Having determined

that they were not, the Court necessarily found prejudment interest on that category of damages to

be unavailable.  Here, there is no claim that the premium Zurich seeks to recover is itself not

recoverable.  In other words, Watts has not claimed that Zurich may not recover the money

allegedly due and owing as a result of the breach of contract due to its failure to mitigate by

drawing upon the letter of credit.   Prejudgment interest is available on a ministerial basis on

whatever damages are recoverable. Finally, prejudgment interest provides no windfall to Zurich.

It compensates Zurich for not having the funds during the prejudgment period.  Watts had the

funds.  To deny the interest would provide a windfall to Watts.

Accordingly, I RECOMMEND that the Court ALLOW IN PART AND DENY IN PART

WATTS'S Motion for Summary Judgment.

### Zurich's Motion for Summary Judgment on Damages

Zurich moves for summary judgment with respect to its damages.  Docket # 159.  It

asserts that having prevailed against Watts's efforts to escape liability (both with respect to its

previous argument that it was not the responsible party (see Docket #s 125, 136) , and also

presuming that it withstands the secondary attacks on liability contained in Watts's summary

judgment motions discussed supra), it is entitled to damages in the amount of $816,185 in

outstanding premium, plus pre-judgment interest exceeding $696,616.  Docket # 160.

Watts raises three categories of challenges: (1) first, it asserts that even having withstood

14

Watts's and CIRCOR's previous motions, Zurich has not necessarily prevailed with respect to liability and in this respect it raises the same arguments it has raised within its own motions for summary judgment, considered <u>supra</u>; (2) second, it argues that Zurich has not met its burden of demonstrating the reasonableness of its retrospective premium damages and that this presents an issue for trial; and (3) third, it attacks the calculations of prejudgment interest in various respects.

<u>Watt's Defenses With Respect to Liability</u>

In opposition to Zurich's motion, Watts reasserts all of the arguments discussed above. The different context presented by Watts's status as non-movant requires some additional analysis because considering these arguments under Zurich's motion requires that the Court "view the record in the light most favorable to the nonmoving party [<u>i.e.</u>, Watts], and to draw all reasonable inferences in the nonmoving party's favor." <u>LeBlanc v. Great American Ins. Co.</u>, 6 F.3d 836, 841 (1st Cir.1993).

If the Court accepts my Recommendation concerning Watts's motion as to the 16th Adjustment, no further analysis is necessary with respect to that invoice.

Regarding the 17th Adjustment, Watts raises waiver and estoppel arguments.  In considering Watts's and CIRCOR's previous motions, the Court previously considered and rejected the argument that Zurich had waived its right to payment on the contract by attempting to collect from CIRCOR rather from Watts.  Docket # 125 at 14-15.   Watts had raised the same arguments concerning the "do not pay" instruction at that time that it now raises.  <u>See</u> Docket # 65 at 15-18.  But the waiver argument here is slightly more nuanced in that Watts argues that Zurich waived a specific payment rather than that Zurich waived all of its contractual rights.

Even drawing all inferences in Watts's favor, given both the applicable law of the case

(which includes Marsh acting as Watts's agent (see, supra at 7), as well as a previous ruling that

Zurich was entitled to attempt to collect from CIRCOR and then attempt to recover from Watts if

unsuccessful (see Docket # 136 at 3)), and given the undisputed factual background (including

that Watts objected to Marsh that it was not liable for premium attributable to CIRCOR, that

Zurich objected to Watts's agent Marsh about the 'do not pay' memo, and that Zurich attempted

unsuccessfully to collect from CIRCOR), no jury could reasonably conclude that the only

reasonable interpretation of Zurich's conduct was that it had waived its right to collect the 17th

Adjustment from Watts.  See supra at 5-6 (citing KACT, Inc. v. Rubin, 62 Mass.App.Ct. 689, 695

(2004) (quoting Attorney Gen. v. Industrial Natl. Bank, 380 Mass. 533, 536 n. 4 (1980)).

Similarly, Watts's estoppel argument fails as the statement upon which it asserts reliance (the "do

not pay" instruction) was the statement of Watts's agent, objected to by Zurich.  And, as

explained earlier, Watts has no reasonable expectation of proving detriment to it as a consequence

of the "do not pay" memo.  See supra at 6-7 (citing Anzalone v. Admin. Office of the Trial Court,

457 Mass. 647, 661 (2010) (quoting Sullivan v. Chief Justice for Admin. & Mgt. of the Trial

Court, 448 Mass. 15, 27–28, (2006)).

With respect to the 20th Adjustment, Watts's argument presents a question of law –

namely, whether or not the contract imposes a condition precedent of annual billing such that the

contract imposes upon Watts no obligation to pay unless Zurich first satisfies the annual billing

requirement.  For the reasons already explained (see supra at 7-11), I RECOMMEND that the

Court find that the contract creates no such condition precedent.  In addition, even when drawing

all reasonable inferences in Watts's favor, I recommend that the Court determine that Watts has

failed to raise a genuine issue of material fact requiring a trial as to whether the failure to bill

16

annually constitutes a material breach of the contract.  I make this recommendation for the reasons explained <u>supra</u>.

Regarding Watt's assertion of Zurich's failure to mitigate, this argument presents questions of law resolved against Watts, if the Court accepts my recommendation, <u>supra</u>. Accordingly, I RECOMMEND that the Court reject these arguments in the context of Zurich's motion.

I now turn to the additional arguments Zurich advances to support its request for entry of summary judgment in its favor.

<u>Reasonableness of Reserves Calculations</u>

Zurich's retrospective premium adjustments generally had two components: amounts it actually paid out of pocket on claims; and, its reserves for future losses and expenses (consisting of losses reported but not yet paid and the anticipated administrative costs of resolving those claims).

Watts asserts that the summary judgment record "contains no documentary evidence supporting the reasonableness of the large reserves that make up most of the amount sought, or even evidence of the underlying legal expenses which comprise the remainder." Thus, it argues, Zurich has not carried its burden of proving that the losses in question were incurred reasonably and in good faith.  Docket # 207 at 4-5 (citing <u>Deerfield Plastics Co., Inc. v. The Hartford Insurance Co.</u>, 404 Mass. 484, 487 (1989)).  In <u>Deerfield</u>, however, the Supreme Judicial Court characterized the insurer's duty of proving that it acted reasonably as one arising in the context of the insured having alleged that the insurer acted negligently.  <u>Id.</u> at 486-87.  Watts has not argued that Zurich acted negligently.  Watts is objecting that Zurich has not sufficiently established

exactly how it set its reserves.  The Massachusetts Superior Court considered and rejected the argument here made by Watts, noting that the <u>Deerfield</u> plaintiff had already shown negligent claims investigation.

> <u>Deerfield</u>'s discussion of the allocation of the burden of proof is not directly applicable to the present case. In the present case, the plaintiff is the equivalent of the insurer seeking to recover payment in the first place. Nothing in <u>Deerfield</u> suggests that [insurer] must, in addition to what it has already shown, specifically justify each and every claim decision it made over the course of the entire life of the contract in order to get reimbursed for monies it paid out . . . With no evidence to counter [insurer's] showing that it did provide the investigation and review services called for in the contract, Bear Hill can not impose on New England the enormous burden of justifying the reasonableness of each and every payment made.

<u>New England Mut. Life Ins. Co. v. Bear Hill Nursing Home, Inc.</u>, 1995 WL 808629 *3 (Mass.Super.March 24, 1995).

The same analysis is applicable in this case.  The contract here at issue gave to Zurich the right to set reserves ("The company shall compute the earned retrospective premium based upon incurred losses").  Docket # 159-1 at 8. The contract set out formulas for calculating adjustments which were agreed to between the contracting parties.  <u>Id.</u> at 6-8.  The summary judgment materials proffered by Zurich establish that it did so.  Zurich has introduced copies of the adjustment invoices, including calculations for the retrospective premiums.   Docket # 159-1 at 15-1, Ex. A2-A7.   Zurich affiant, Dale Engle, is the underwriter assigned to Watts's account, who affirms that the adjustments were calculated in accordance with the agreed-upon formulas. Zurich's expert opines that its reserving practices were reasonable and appropriate, and that his examination of the relevant claim files revealed that those procedures were adhered to with respect to the subject policy.  Docket # 159-7.   This suffices to meet Zurich's burden on summary judgment, absent evidence submitted by Watts raising a genuine issue of material fact

as to the reasonableness of the bills predicated upon the reserves or expenses.

Watt's 30(b)(6) deponent conceded that at no time prior to the filing of this lawsuit did Watts object that the adjustments at issue were inappropriate on the grounds that the reserves were improperly determined.  See Docket # 159-3.  At her deposition, Watts's own expert declined the invitation to offer any opinions with respect to the appropriateness of the amounts of the reserves set by Zurich, the amounts paid by it on the asbestos claims, the amount paid out in indemnity expenses, or the amounts paid out in the defense of the asbestos claims.  Docket # 159-8 at 3-4.  Indeed, Watts's memorandum of law in opposition to Zurich's motion does not even refer to Watts's own expert.[5]  Thus, there is nothing in the summary judgment record (other than Watts's demands for further details) to call into question the reasonableness of Zurich's reserve calculations.

Watts objects that Zurich had a "contractual obligation" to provide Watts with notice of reserve increases of $10,000 or more and that "there appears to be no evidence that Zurich fulfilled" that obligation.   Docket # 2017 at 7.  No such obligation appears in the contract, however.  Internal Zurich case handling instructions do state, "[w]henever a reserve is posted at, or increased by $10,000, send a notification to Elaine Prokop at Watts Regulator . . ." See Docket # 209-13 at 8.  As discussed previously, Zurich need not demonstrate its procedures with this level of specificity and its summary judgment burden does not require that it demonstrate

---

[5]  Watts maintains that discovery violations (see Order on Motion to Compel of this date) deprived their expert of the opportunity to make competing calculations.  See Docket # 208 at ¶ 25.  In her report (which Watts submits only in opposition to Zurich's Motion to Strike the expert), she does offer opinions as to the soundness of Zurich's methodology.  See Docket # 199.  In any event, the report is not part of the summary judgment record.   If Watts was unable to oppose summary judgment due to a need for additional discovery, it could have filed a motion pursuant to Fed. R. Civ. P. 56(d).

compliance with this aspect of its internal procedures.  See supra at 16-17.  Ms. Prokop was in any event a witness in this case available to Watts, and the summary judgment record is equally notable for the absence of an affidavit from her asserting that Zurich in fact did not meet this obligation.  Similarly, although Watts notes in its opposition to Zurich's motion that the rationale in changes in reserves had been redacted by Zurich in certain case summaries (and although Watts filed with its opposition the redacted copies of same), Zurich had previously made unredacted copies of the same documents available to Watts.  See Docket #s 207 at 7-8; 208 at ¶¶ 93, 97; Docket #s209-10- 209-11; Docket # 228

Prejudgment Interest

Watts makes some additional arguments regarding prejudgment interest not advanced in support of its own motions for summary judgment.

Watts also argues that Zurich may not collect prejudgment interest on the reserves because the reserves are merely estimated projections of future expenses which at the time of the adjustments Zurich had not actually paid, and because "Massachusetts law limits prejudgment interest to the period of time "that a person wrongfully deprived of the use of money." Docket # 207 at 19 (citing Spiritual Trees v. Lamson and Goodnow Manufacturing Co., 424 F.Supp.2d 298, 300 (D. Mass. 2006)).  However, Zurich is not seeking interest on money it set aside as reserves, but for unpaid bills for which it had a contractual right to collect.  The invoices represent actual sums of money of which Zurich was deprived as of the payment due dates.  That the amounts due under the contract represent reserves, in part, does not change the interest analysis.

Watts next argues that permitting prejudgment interest to accrue during the period of the Standstill Agreement (i.e., from October 21, 2008 to July 16, 2010) is improper.  See Docket #

222-5.  Watts contends that the agreement did not explicitly provide that interest would continue to accrue and therefore this period does not constitute a period of wrongful retention of money warranting interest.  Rather it says, the Standstill Agreement should temporarily suspend the accumulation of prejudgment interest unless otherwise explicitly stated therein.  Zurich responds that the Standstill Agreement contains a general preservation of rights which is effective to preserve the accumulation of prejudgment interest in the absence of their exclusion.

The period during which the Standstill Agreement was in effect is analogous to a litigation stay sought for the purpose of mediation or other settlement negotiations.  There is no general principle that the accumulation of interest is suspended during such periods, and in the absence of a provision in the Standstill Agreement suspending the accumulation of prejudment interest (for which Watts certainly was free to negotiate), the Court cannot conclude that its recovery for that period is barred.

Finally, Watts argues that there remains a dispute about the date at which it received invoices from Zurich and that Zurich has failed to carry its burden of demonstrating that Watts received the invoices.  Watts asserts that the record does not contain evidence that it received the 17th Adjustment before April 30, 2003 and the 19th Adjustment before May 9, 2005 (whereas Zurich seeks interest from February 3, 2003 and February 24, 2005 respectively).[6]  Docket # 207 at 20.  This dispute between the parties affects only the start date for calculating any prejudment interest; it turns upon whether or not Marsh was Watts's agent for purposes of receipt of the invoices.  As noted previously, the record evidence and applicable law cited compel the

---

[6] Although Watts makes a similar objection with respect to the 16th Adjustment, I have recommended that Watts prevail on its summary judgment motion with respect to that invoice.

21

conclusion that Marsh was Watts's agent.  See supra, at 7.  While ordinarily this would present a fact question, here summary judgment is appropriate because a jury could not reasonably conclude that Marsh was acting as Zurich's agent in this respect.

III.   CONCLUSION

For the foregoing reasons, I RECOMMEND that the Court DENY Zurich's Motion for Summary Judgment  (Docket # 157) with respect to the 16th Adjustment, and ALLOW the motion in all other respects.

I further RECOMMEND that the Court ALLOW Watts's Motion for Partial Summary Judgment (Docket # 168) with Respect to the 16th Adjustment and DENY IT in all other respects.

I further RECOMMEND that the Court DENY Watts's Motion for Partial Summary Judgment with Respect to Zurich's Failure to Mitigate Damages (Docket # 172).[7]

If the Court accepts my Recommendation, then nothing remains for trial, and the Court should enter judgment in Zurich's favor in the amount of  $808,971 ($815,185, less the $6,214

---

[7] The Parties are hereby advised that any party who objects to these proposed findings and recommendations must file a written objection thereto within 14 days of receipt of this Report and Recommendation.  The written objections must identify with specificity the portion of the proposed findings, recommendations, or report to which objection is made, and the basis for such objections.  See Fed. R. Civ. P. 72 and Habeas Corpus Rule 8(b).  The parties are further advised that the United States Court of Appeals for this Circuit has repeatedly indicated that failure to comply with Rule 72(b) will preclude further appellate review of the District Court's order based on this Report and Recommendation.  See Keating v. Secretary of Health and Human Services, 848 F.2d 271 (1st Cir.1988); United States v. Emiliano Valencia-Copete, 792 F.2d 4 (1st Cir.1986); Park Motor Mart, Inc. v. Ford Motor Co., 616 F.2d 603 (1st Cir.1980); United States v. Vega, 678 F.2d 376, 378-379 (1st Cir.1982); Scott v. Schweiker, 702 F.2d 13, 14 (1st Cir.1983); see also Thomas v. Arn, 474 U.S. 140, 106 S.Ct. 466 (1985).

amount of the $16th Adjustment), plus prejudgment interest in the amount prescribed by statute through the date of entry of judgment.

　/s/ Leo T. Sorokin
Leo T. Sorokin
Chief United States Magistrate Judge